IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

Christina Kennedy,                    )
                                      )    Civil Action No. 2:10-1661-RMG-BHH
                    Plaintiff,        )
                                      )    **REPORT AND RECOMMENDATION**
                                      )        **OF MAGISTRATE JUDGE**
                                      )
          vs.                         )
                                      )
Credit Central, Inc.,                 )
                                      )
                    Defendant.        )
_____)

This matter is before the Court on the defendant's motion for summary judgment [Doc. 21], pursuant to Federal Rule of Civil Procedure 56. In her Complaint, the plaintiff alleges claims for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended. The defendant has moved for summary judgment as to both.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTUAL BACKGROUND

The defendant, Credit Central, Inc., is in the business of extending small loans to consumers. (Maas Dep. at 20-21, 26). The defendant also prepares tax returns and sells various forms of insurance to the public. *Id.*

In 2008 and 2009 defendant had about 32 branches in South Carolina. Each branch was managed by a branch manager. Under the branch manager there was an assistant manager and a customer service representative, or "CSR." (Maas Dep. at 18; Stokes Dep. at 14-16, 21.) The branch manager, in turn, reported to a supervisor. *Id.* The supervisor typically would have a territory which encompassed eight (8) branch offices. It has been represented that in 2008 and 2009, defendant employed four (4) supervisors in the State of South Carolina. The supervisors reported to the State director.

In 2008 and 2009, the State director was Louise Stokes ("Stokes") who, at least as of July 2008, resided in Charlotte, North Carolina. Stokes reported to Tommy Jones. (Stokes Dep. at 15.) One of the four (4) supervisors in South Carolina was Jim Maas. Maas' territory included the defendant's locations in the Charleston, South Carolina area. In the summer of 2008, the defendant opened up a new branch in Summerville, South Carolina. This new office was in Maas' territory. (Maas Dep. at 87-88.)

In the summer of 2008, Maas began hiring employees to work at the new Summerville branch. On or about June 3, he hired the plaintiff, Christina Kennedy, to be the branch manager at the Summerville location. (Maas Dep. at 87-88; Pl. Dep. at 11.) The plaintiff was hired at an annual salary of $36,000 and, although a matter of dispute between the parties, was allegedly promised, by Maas, that she would receive an additional $1,000 a month in bonuses guaranteed. (Pl. Dep. at 72, 74.)

In late June or early July 2008, Maas hired Susan Reynolds (now Susan Gould) as the assistant manager of the Summerville branch. (Maas Dep. at 40-42.) Some years earlier, Maas and Reynolds had engaged in a consensual sexual relationship. (Maas Dep. at 39-40; Gould Dep. at 4.) When Reynolds went to the Summerville branch for her interview, Maas apparently made an advance at her, which she declined. (Gould Dep. at 48.) Nevertheless, Maas sent Reynolds to interview with the plaintiff the next day and Reynolds was hired.

Once the office was established, Maas would visit once every three (3) or four (4) weeks. (Maas Dep. at 78.) Shortly after plaintiff and Reynolds were hired, Maas began to sexually harass both of them. As to the plaintiff, she alleges that Maas' conduct included, but was not limited to, the following:

• He took the plaintiff to lunch and told her she was attractive and would look good in shorts;

• In his car, he told the plaintiff people at work were already talking about the two of them being together romantically;

• He told the plaintiff he had a dream about her and that he dreamed they were married;

• He would stare at the plaintiff;

2

• He took pictures of the plaintiff with his cell phone and then advised the plaintiff that he sent her picture to another branch manager and that the branch manager texted back, stating he could not keep his hands off himself;

• During a lunch, Maas told the plaintiff that she had everything in the right place;

• Maas instructed the plaintiff to show cleavage and to flirt with males in order to obtain business;

• On one occasion Maas showed up at the plaintiff's apartment in the evening. Once there, he began to rub the plaintiff's back in front of her children;

• At least twice Maas called the plaintiff and asked her if she wanted to be friends with benefits;

• Maas repeatedly tried to get the plaintiff to go out with him;

• At least twice Maas texted the plaintiff at 11:00 p.m. and asked her where she was and what she was doing;

• Maas would stand behind Kennedy in the office and put his face right next to her hair or ear so that his face would be touching plaintiff. He would then smell her hair;

• On one occasion in the office Maas came up behind the plaintiff, put his arm around her waist and pulled her towards him. In doing so, he had his arm around the plaintiff's breast;

• On another occasion, while the plaintiff and Maas were seated in the front seat of a car together at a quarterly meeting in Greenville, South Carolina (in October 2008), Maas reached over and grabbed the plaintiff's thigh;

• At another quarterly meeting in April of 2009, when all the managers were out having drinks together, Maas reached over and grabbed the plaintiff's breasts;

• He would constantly rub her back and arms;

• In addition to the above, the plaintiff would hear Maas make sexual comments in the office to Reynolds.

(Pl. Dep. at 35-36, 42-48, 143-163.)  During this same time, it is also alleged that Maas was sexually harassing Reynolds on a regular basis as well.  (Gould Dep. at 11-12, 20-21, 26-32, 48-56, 59-60.)

In January of 2009, Maas stopped paying the plaintiff her $1,000 bonus without notice or reason. (Pl. Dep. at 75, 78-80.)  Subsequently, on or about March 16, 2009, Maas gave the plaintiff an Employee Counsel Record for low levels of account gain at her location. According to the Counsel Record, the loan volume was nearly 16% behind for the year.  (Pl. Dep. at 94-97.)  Then, on or about June 4, 2009, Maas gave the plaintiff another

3

Employee Counsel Record, this time for having a cash shortage of $120 in her drawer and not reporting it. (Pl. Dep. at 116.)

On July 14, 2009, the plaintiff traveled to the Second Quarterly Managers' meeting that was scheduled to take place in Greenville the following day, July 15, 2009. (Pl. Aff. ¶ 7.) When the plaintiff arrived, she had dinner with Maas and other managers. Later that evening, at or around 11:00 p.m., Maas began to send text messages to the plaintiff. (Pl. Dep. at 169-71; Pl. Aff. ¶ 10.) The first text message identified Maas' room number and asked if the plaintiff was coming. *Id*. The second text message asked the plaintiff what she was going to do. *Id*. The third text message was a question mark. *Id*. And, the last text asked the plaintiff if she wanted some company. *Id*. Maas admits sending the text messages and he admits that the plaintiff ignored the text messages. (Maas Dep. at 116.)

The next day, Maas called the plaintiff and told her that an auditor was at her branch and that the plaintiff's assistant manager (Reynolds) had shown up five (5) minutes late. (Pl. Dep. at 123-25.) Later, as Maas was walking into the quarterly meeting, he allegedly looked at the plaintiff and rolled his eyes. *Id*. The plaintiff took this to mean he was not happy with her because she ignored his text messages the prior evening.

Thereafter, the plaintiff immediately went to Stokes and reported that Maas had been sexually harassing her. (Pl. Dep. at 19, 26-27, 30-32.) During the meeting, the plaintiff told Stokes everything she could about Maas' conduct and she showed Stokes Maas' text messages from the night before. *Id*. Stokes told the plaintiff to prepare a written statement. *Id*. The plaintiff has testified that Stokes lacked a sense of urgency in questioning her; that Stokes made plaintiff feel like less of a person; that Stokes displayed a lack of concern; that she would not make eye contact with the plaintiff; and seemed to be rushing through her questions. *Id*.

The following day, Thursday, July 16, 2009, Stokes went to the Summerville office and investigated the complaint. In doing so, she interviewed the plaintiff and Susan Reynolds. (Pl. Dep. at 20-21.) On that day, the plaintiff also gave Stokes her handwritten statement which outlined some of the harassment. (Pl. Dep. at 22, 25.)

4

Stokes testified that, after interviewing the plaintiff and Reynolds, she was not convinced that the allegations against Maas were solid. (Stokes Dep. at 84, 86.) Later that day Stokes met with Maas and obtained a statement from him. (Stokes Dep. at 77 and Ex. 9 thereto.)

On July 20, 2009, Stokes met with Maas and Eric Jackson at a Chick-fil-A in Columbia, South Carolina. Jackson was a supervisor over stores in the Columbia area. Stokes instructed Jackson that he would now be over the Summerville location and that Maas would be over one of Jackson's locations in Columbia. (Stokes Dep. at 93-95.) Maas would be over his seven (7) other locations in the Charleston area and the one location in Columbia and Jackson would be over his approximately seven (7) locations in the Columbia area and the one location in Summerville.

Later that morning, Stokes met Maas at another restaurant in Orangeburg, South Carolina and gave him a written warning for the text messages he sent to the plaintiff on July 14, 2009. (Stokes Dep. at 53-55 and Ex. 3 thereto).

Jackson stayed at the Summerville location for two (2) days, July 20 and 21, 2009, going through files and familiarizing himself with the location. (Jackson Dep. at 56, 61.) On or about July 21, 2009, Stokes transferred Reynolds – the plaintiff's assistant manager and primary witness to Maas' harassment – out of the Summerville location and into the North Charleston location. (Maas Dep. at 139-140; Stokes Dep. at 98-99; Pl. Aff. ¶¶ 15-18.)

Jackson visited the Summerville branch approximately a week later, on or about July 29 and 30, 2009. During this visit, he talked to the plaintiff about growth issues. (Pl. Dep. at 133-135.) The plaintiff testifies that Jackson put her on a three-day notice regarding growth. According to the plaintiff, Jackson meant that she had to procure over 100 accounts in three (3) days. (Pl. Dep. at 134-135.) Jackson, however, does not recall placing the plaintiff on a three-day notice and, in fact, he testifies he never suspended the plaintiff, wrote her up or gave her a verbal warning during the brief time he supervised her. (Jackson Dep. at 67, 70-72.) Jackson does state that, during his second visit with the plaintiff, he told her she was not trending with her growth or getting enough accounts. (Jackson Dep. at 68-69.) Contrary to this testimony, there is evidence that the defendant discussed high

5

delinquency rates and bad debt with the plaintiff, not growth issues. (Pl. Dep. Exs. 23, 24; Pl. Ex. 8 at 2.)

After Jackson's July 30, 2009 visit to the Summerville location, Stokes decided to fire plaintiff. (Stokes Dep. at 102.)  Thereafter, on or about August 5, 2009, having only supervised the plaintiff for eleven (11) days, he terminated her, with Stokes' approval, because the branch was not trending well.  (Jackson Dep. at 61, 76, 86-87.)  A couple days after the plaintiff was fired, Maas was put back over the Summerville location and Jackson went back to his Columbia location.  (Maas Dep. at 138-139; Jackson Dep. at 104.)

## APPLICABLE LAW

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or  "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the

movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### I.    Sexual Harassment

The plaintiff has first pled a claim for sexual harassment. Title VII of the Civil Rights Act of 1964 states that "[i]t shall be an unlawful employment practice for any employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). To establish a claim for sexual harassment, the plaintiff must prove by a preponderance of the evidence that he was subjected to (1) unwelcome harassment; (2) based on his sex; (3) that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere; and (4) that is imputable to the defendant. *See Howard v. Winter,* 446 F.3d 559, 565 (4th Cri. 2006); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

The defendant argues, what is known in employment law parlance as the *Faragher/Ellerth* defense, that the plaintiff's claim for sexual harassment should be dismissed because it had in place a policy that would have prevented and/or promptly corrected any unlawful behavior and, yet, the plaintiff unreasonably failed to take advantage of such policy. *See Faragher v. City of Boca Raton*, 524 US 775, 807 (1998). The parties are in accord that only when alleged sexual harassment does not result in, or otherwise affect, a tangible employment action, a defendant may raise this affirmative defense to liability or damages. *See Faragher*, 524 U.S. at 808. "The defense comprises two

7

necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 US 775, 807 (1998). To satisfy its burden under the first element of the defense, an employer need not as a matter of law promulgate an anti-harassment policy with a complaint procedure. *Id.* However, proof that an employee has failed to use a complaint procedure will normally suffice to satisfy the employer's burden under the second element of the defense. *Id.* at 808.

The parties first depart over whether or not the defense is implicated. The plaintiff says that she suffered a tangible employment action; the defendant contends she did not. Specifically, the plaintiff Kennedy testifies that when she was hired, Maas agreed to pay her a salary of $36,000, plus a guaranteed bonus of $1,000 a month. (Pl. Dep. at 74.) The defendant's Human Resource Update form seems to plainly confirm this arrangement. *Id.* at 72 & Ex. 9 thereto. As the plaintiff contends, it does not appear that either Maas' promise to pay the bonus, nor the HR Update form indicate that the guaranteed bonus was only for a limited amount of time. *See id.* Yet, after paying the bonus for seven (7) months, Maas stopped paying it to the plaintiff, allegedly, without any explanation or notice. (Pl. Dep. at 75, 78-80.) The plaintiff contends that at precisely this time, she was declining the sexual advances of Maas.

The defendant's initial rejoinder is that the allegation concerning the bonus is eleventh hour insofar as it was neither included in her Charge of Discrimination to the EEOC nor in her Complaint. (See Pl. Dep. Ex. 3, 4, 5, 6; Def. Ex. V.) It is true; the plaintiff's allegations concerning the bonus appear recently emphasized. But, the plaintiff has not identified, and the Court has not found, any case which recommends that estoppel from advancing the position is, therefore, now appropriate. To be clear, the sexual harassment claim itself has always been a part of the plaintiff's Charge and Complaint; it is the emphasis on the elimination of the bonus as an adverse employment action, which appears more recently developed or discussed.

8

Instead, the Court is better, although not ultimately, persuaded by the additional argument that the claim, as it would purport to pivot on the alleged denial of the bonus, ought to be considered as time-barred.  It is not a point of disagreement that Title VII requires that a "charge under this section [42 U.S.C. § 2000e-5] shall be filed within one hundred and eighty days [or 300 days when applicable] after the alleged unlawful employment practice occurred." 42 U.S.C.A. § 2000e-5(e)(1)).  As the United States Supreme Court has reiterated, the charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  The alleged termination of her $1000 monthly bonus in January 2009 constituting a discrete employment action is, therefore, plainly 300 days prior to the filing of her Charge on December 7, 2009.  (Def. Ex. V.)  The Court, however believes there is another consideration.

The plaintiff has never addressed it and the Court does not mean to unnecessarily reach out to defend the claim, where the plaintiff herself has not, but the Lilly Ledbetter Fair Pay Act seems in play.  The United State Supreme Court had previously held that a past discrete discriminatory act regarding an employee's pay, outside the limitations period for filing a Charge, is not actionable, even if the prior act has consequences that reach into the limitations period. *See Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007). That decision, in regards to pay claims, prompted a Congressional response, and on January 29, 2009, the "Lilly Ledbetter Fair Pay Act of 2009" was signed into law. The Act amends Title VII, specifically 42 U.S.C. § 2000e-5(3), by adding the following provision:

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e-5(e)(3)(A).

Astutely, the defendant has anticipatorily argued that the Fair Pay Act does not apply here. The Court is of the view that it likely does.

As the defendant notes, courts have held that the Fair Pay Act means that each paycheck "gives rise to a new claim of an unlawful employment practice even though they were 'simply a periodic implementation of an adverse decision previously made.'" *Mikula v. Allegheny County Of PA*, 583 F.3d 181, 186 (3d Cir. 2009) (citation omitted).  It seems that the facts of this case meet this criteria.  Specifically, the plaintiff alleges that the bonus was guaranteed in spite of her performance and was to recur on a monthly basis.  This is, of course, a disputed issue.  (See Pl. Dep. at 77.)[1]  But, the plaintiff has submitted evidence in support of her position – that it is guaranteed, which a jury might believe.  (Pl. Dep. Ex. 9.)  If, therefore, the bonus was indefinitely intended, it resembles compensation in the nature of a recurring paycheck rather than a periodic or sporadic and contingent bonus.  In other words, if the bonuses were absolutely guaranteed on a monthly basis, their suspension, albeit at one point in time, triggered a downstream repetition of incidents, each one arguably resetting a new discrimination claim, every time she failed to receive the bonus allegedly due absolutely.[2]

Although the Court has not identified any case addressing the issue one way or the other, in the context of the Ledbetter amendment, the plain understanding of the phrase "wages, benefits, or other compensation" would seem to encompass the bonuses at issue here.  Title VII does not define the words "wage" or "compensation."  *See* 42 U.S.C. § 2000e.  But, other courts have concluded that it is "improbable that the term 'compensation' would not encompass [] bonuses received by [employees] . . . in light of the plain meaning of the word and the Equal Pay Act definition of compensation found in 29 C.F.R. § 1620.

---

[1]  The defendant cites this portion of the deposition transcript as evidence of the plaintiff's admission that the bonus was somehow exclusively performance based.  Frankly, the exchange is a little difficult to follow. But, even there the plaintiff only agrees that she "got **more** than the guaranteed bonus" based on having grown a "bunch of accounts."  (Pl. Dep. at 77 (emphasis added).)She seems to plainly imply that her performance declined in January 2009.  But, she expressly reiterates that she expected the bonus to accrue indefinitely and that she was not told otherwise, in spite of the immediately preceding admission that her performance had been waning. *Id.* at 78.  That claim, included in the deposition, is not congruent with any sort of confession that the bonus was performance contingent.

[2]  Although the bonus was terminated in January 2009, the same month the Fair Pay Act was adopted, there does not appear to be any issue of retroactive application.  *See* Pub.L. No. 111-2, § 6, 123 Stat. 5, 7; *Hester v. North Ala. Center For Educational Excellence*, 353 Fed. Appx. 242, 243 (11th Cir. 2009).

*Gallagher v. Kleinwort Benson Government Securities, Inc.*, 698 F.Supp. 1401, 1405 n.5 (N.D. Ill.1988) (citing *Kouba v. Allstate Insurance Co.*, 523 F. Supp. 148, 158 (E.D. Ca. 1981), *rev'd on other grounds*, 691 F.2d 873 (9th Cir.1982) (stating that regulation defining "wages" for the purposes of the Equal Pay Act is useful in determining "wages" for the purposes of Title VII.)   Consequently, the Court would conclude both that bonuses, in general, are a contemplated part of the word "compensation" for purposes of the Fair Pay Act and, more specifically, that issues of fact exist as to whether the bonuses here were actually non-contingent such that they might be viewed as reasonably anticipated to periodically recur, like a paycheck.   *See Mikula*, 583 F.3d at 186.

The defendant has also argued that the plaintiff has not alleged the termination of a guaranteed bonus that was "discriminatorily unfair."  (Def. Reply at 5 n.6.)   In other words the defendant seems to imply that there had to be some systemic or relative unfairness affected by the discrimination in the bonus allocation itself.   The Court may be misreading the point.   Regardless, the statute requires no more than a "discriminatory compensation decision."   42 U.S.C.  § 2000e-5(e)(3)(A).   A termination of her bonus for declining Maas' sexual advances qualifies.   This seems to be true wholly a part from whether or not other similarly situated individuals were receiving or believed they were receiving guaranteed bonuses.   The defendant has emphasized the plaintiff's ignorance about the treatment of other managers in regards to their bonuses.   But, the plaintiff, ostensibly, had been promised a compensation item, which was, again, ostensibly, terminated on account of her having rejected illegal sexual advances.   That is, by statutory and case law definition, a discriminatory compensation decision.

Accordingly, the plaintiff has created an issue of fact about the presence of various adverse employment actions, within the 300-day period, occurring in months subsequent to January 2009, each time a bonus was not delivered.   As a result, the *Faragher/Ellerth* defense is unavailable, for the presence of an adverse employment action.

The plaintiff emphasizes that she was also terminated.   The defendant interprets this point to mean that the plaintiff thinks the adverse employment action was simply the alleged *threat* by Maas on July 16, 2009 that he intended to replace the plaintiff as branch manager.  (Def. Reply at 6.)   The defendant argues that the threat cannot constitute any

11

employment action because Maas, in fact, indisputedly, did not fire the plaintiff the next day and was, he himself, replaced prior to the time when the plaintiff actually was fired.

But, the Court disagrees that the plaintiff is claiming that the threat *itself* was the tangible action. She plainly argues, "Maas' sexual harassment cluminated in the plaintiff's termination. (Pl. Resp. at 15.) Rather, she means to associate Maas, by virtue of his threat and prior sexual advances, with her later termination, notwithstanding the fact he was not the overt decisionmaker to the termination decision.

The plaintiff emphasizes that Louise Stokes testified in clear terms that, when she made the decision to fire the plaintiff, three weeks later, in late July of 2009, she did so based, in part, on information that Maas had been responsible for keeping during his time as supervisor and which was, in fact, supplied to her. (Stokes Dep. at 102-103.) The plaintiff argues that "this is negative information being provided during a period of time when Kennedy was rejecting Maas' advances." (Pl. Resp. at 16 (citing *Pitter v. Community Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 394-395 (D. Md. 2010) (finding issue of fact exists as to whether harassment of plaintiff culminated in her termination where plaintiff rejected harasser's repeated advances and plaintiff's eventual termination by others was based on reports given by harasser).

But, the Fourth Circuit takes a strict view regarding the determination as to who can be considered an agent of an employer for discriminatory liability purposes. *See, e.g., Ricci v. DeStefano*, --- U.S. ----, 129 S. Ct. 2658, 2688-89 (2009) (Alito, J., concurring) (discussing various circuits' approaches to the question of when an employer may be held liable based on the discriminatory intent of subordinate employees who influence but do not make the ultimate employment decision and noting that the Fourth Circuit has the "least employee-friendly standard"); *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 291 (4th Cir.2004) (discussing the determination of who is a decision maker for purposes of liability under discrimination statutes).

In defining the parameters of when an employer may be held liable for the discriminatory animus demonstrated by an employee who is subordinate to the ultimate decision maker, the *Hill* Court found that Title VII does not limit the discrimination inquiry to the actions or statements of "formal decisionmakers" for the employer. *Hill*, 354 F.3d at

290. Such an approach, the *Hill* Court noted, would allow an employer to insulate itself from liability "simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." *Id.* at 290. Nonetheless, "to survive summary judgment, an aggrieved employee who rests a discrimination claim under Title VII or the ADEA upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one *principally responsible* for the decision or the actual decisionmaker for the employer." *Id.* at 291 (emphasis added).

In this case, even viewing the facts in the light most favorable to the plaintiff and assuming that Maas was motivated by unlawfully discriminatory animus, it is difficult to conclude that there is sufficient evidence to support a determination that the ultimate decision maker – Stokes – was so influenced by either the documentation kept under Maas or Maas himself that he should be considered the actual decision maker. The plaintiff presents no evidence that Stokes blindly accepted or merely "rubber-stamped" any view of Maas concerning the plaintiff. In fact, Stokes testified that Maas, himself, had "no input" and that she never had any conversation with Maas concerning the decision. (Stokes Dep. at 103.) The plaintiff has not offered any serious evidence to the contrary.

Instead, Stokes testified that she relied on the recommendation of the plaintiff's then supervisor, Eric Jackson. Of course, this representation is somewhat dubious considering Jackson's short tenure as supervisor over the plaintiff's branch. (See Jackson Dep. at 61, 76, 86-87.) But, even still, there is no affirmative evidence from which a jury could conclude that it was Maas who was principally responsible, and not Stokes, for the decision to terminate the plaintiff's employment or even moderately so. *See Hill*, 354 F.3d at 289-90 (discussing the "cat's paw" or "rubber stamp" theory of liability but "declin [ing] to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision"). The termination, therefore, does not appear to be

an adverse employment action sufficiently linked to Maas' personal motivest such that *Faragher/Ellerth* is made unavailable.

Notwithstanding, and as recommended, the elimination of the promised bonus is a sufficient and adverse employment action to prohibit the defendant's ability to raise that defense. And, the unavailability of the defense, being the only proposed bases for summary judgment on the sexual harassment claim, weighs in favor of denying the motion in regards to the sexual harassment claim.

## II.    Retaliation

Next, the plaintiff contends that she was retaliated against for having complained of the alleged sexual harassment to Stokes. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he [or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The *McDonnell Douglas* burden shifting scheme, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000). The plaintiff does not attempt to use direct evidence to establish her claim of retaliation.

### A. *Prima Face* Case

In order to establish a *prima facie* case of Title VII retaliation, the plaintiff must prove three elements: (1) that she engaged in a protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action. *See EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005); *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004).

The defendant does not dispute that the plaintiff engaged in protected activity when she reported sexual harassment to Stokes on July 15, 2009. Nor does the defendant dispute that it took an adverse employment action against the plaintiff when it terminated her on or about August 5, 2009. The defendant does, however, disagree that the plaintiff can create any issue of fact as to a causal connection between her report of sexual harassment and her termination approximately three weeks later, or the third element.

14

The Fourth Circuit has held, however, that "very little evidence of a causal connection is required to establish a prima facie case" and "merely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient" to satisfy the causation element of a prima facie retaliation case. *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir.1998); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir.1989) (holding three month time period between protected activity and termination sufficient to satisfy the causation element of the prima facie case of retaliation); *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) (finding causal link between filing of retaliation complaints and the plaintiff's demotion five months later). Here, the plaintiff was terminated less than three weeks after making a complaint of harassment. Alone, the three week's time between the defendant's receipt of the charge of discrimination and the arguable adverse employment action is more than sufficient evidence from which a jury could find a causal connection at the *prima facie* stage.

### B.  Legitimate Non-Discriminatory Reason

The defendant has met its burden to produce a legitimate, non-discriminatory reason for terminating the plaintiff's employment insofar as it has stated that the plaintiff's performance was poor, including poor leadership, poor work effort, not planning her work, not executing her work, insufficient growth, and high delinquency. (Def. Mem. Supp. Summ. J. at 8; Jackson Dep at 86-88.) "Job performance and relative employee qualifications [are] widely recognized as valid, non-discriminatory bas[i]s for any adverse employment decision." *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see also Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir. 2004); *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1998) ("Inova's termination of Karpel was based on her unsatisfactory job performance, including, her tardiness and failure to complete her monthly summaries.")

### C.  Pretext

Because the defendant has proffered a legitimate, non-discriminatory reason for its actions, the plaintiff bears the burden of demonstrating that the real reason for her termination was, in fact, an unlawful one. *See Reeves*, 530 U.S. at 142-43. As is most

15

common, the plaintiff attempts to satisfy this burden by suggesting that the defendant's proffered reasons are pretextual or false. *See id.* at 144.

Specifically, the plaintiff has advanced many reasons why a jury might disbelieve the defendant's explanation for termination. The defendant, in reply, has improvidently reduced them to one, contending that all of the proposed incidents of pretext are merely rephrasing, in different ways, that temporal proximity proves retaliation. This, however, is not a fair characterization of the plaintiff's substantial presentation in this respect. (See Pl. Brief at 20-29.) While, admittedly, some overlap exists, the plaintiff has made a fairly exhaustive showing of the circumstances surrounding her termination which might raise suspicions, in the minds of jurors, regarding the real reason for it. Taken alone, the Court has various concerns about their effectiveness; taken together, however, they present a fairly persuasive story. More critically, the defendant has left that account largely unresponded to, in varying legal and factual respects, and, therefore, in a sense has not met its burden to eliminate issues of fact. Notwithstanding some of the Court's own concerns over the legal efficacy of the plaintiff's evidence, the undersigned will not develop the response where the defendant itself has not, especially in light of the breadth of the plaintiff's story. The plaintiff has offered the following evidence as suggesting falsity in the defendant's account.

     1.    The defendant fired plaintiff approximately twenty (20) days after plaintiff complained about sexual harassment.

     2.    Maas made threatening remarks to both the plaintiff and Reynolds that he was about to fire another female employee in his Conway branch after she made a sexual harassment complaint against him.[3] Not only did he express an intent to fire the employee – he laughed about the complaint and called the complainant(s) lesbians.

---

[3] In December of 2008, a complaint was made to Stokes that Maas had grabbed a female employee's breast in the defendant's Conway, South Carolina location. Apparently, a female employee named Katie Shelley told another employee at the branch, Lisa Maynor, that Maas had grabbed her breast. Maynor then complained. Stokes testified that she investigated the matter and that Shelley denied the incident. (Stokes Dep. at 47-52.) Maas was not disciplined in any way in regard to the complaint. (Stokes Dep. at 49.) However, Maas did confide to Susan Reynolds that a female employee in Conway had made a sexual harassment complaint against him. Reynolds testified that Maas laughed about it and said "Now I have someone to go fire." (Gould Dep. at 16.) Maas also told the plaintiff that a sexual harassment complaint had been made against him out of the Conway branch. According to the plaintiff, Maas laughed about it and called the two women who were involved in the complaint "lesbians." He also told the plaintiff he was going to fire the woman that complained. (Pl. Dep. at 38, 48-49.)

3.      Both the plaintiff and Reynolds testified that they felt Stokes was hostile towards them when Stokes questioned them in regards to plaintiff's sexual harassment complaint. (Pl. Dep. at 27-31.) The plaintiff contends that this is evidence of Stokes' hostility toward the plaintiff for making the complaint.

4.      Stokes refused to believe the allegations of sexual harassment made by the plaintiff, despite compelling proof that the plaintiff had been harassed. (Stokes Dep. at 84-87.)

5.      When Maas was removed as supervisor over the Charleston area, the defendant made strained arrangements concerning area supervisory assignments (Stokes Dep. at 93-95) and then transferred the plaintiff's assistant manager, Reynolds, out of the plaintiff's store, allegedly without good reason (Maas Dep. at 139-140; Stokes Dep. at 98-99; Pl. Aff. ¶¶ 15-18). The plaintiff considers Reynolds the primary witness to the harassment and a top performer, whose absence would have additional affect on the plaintiff's ability to run the branch.

6.      Jackson had only been a supervisor for 9 days when the plaintiff was fired and he had never suspended the plaintiff, written her up, or given her a verbal warning. The plaintiff complains that Jackson would not have had sufficient evidence to participate in the termination decision.

7.      After the plaintiff was terminated, Jackson called the plaintiff and apologized to her, expressing concern over the way the termination was handled and that he had left the company, in part, due to the way the plaintiff had been treated.

8.      The defendant failed to follow its own policy to informally address any performance issue with an employee before termination. (Jackson Dep. at 27-32, 94; Maas Dep. at 80-86.)

9.      The plaintiff was, in fact, not underperforming. (Pl. Dep. at 28, 50, 52, 54, 68-69, 71, 76, 81-89, 92, 94, 98, 100-02, 117-18; Gould Dep. at 10-11, 23-2541, 45.)

10.     The defendant has offered shifting reasons for termination. The defendant advised the EEOC that the plaintiff was fired for delinquency and bad debt issues. (Def. Ex. 8.) One of Jackson's memoranda from July 21, 2009 raises the issue of delinquency at the branch. (Pl. Dep. Exs. 23, 24.) The plaintiff contends that neither document discusses growth issues or lack of accounts. The plaintiff testified that during her July 30, 2009 meeting with Jackson, that he only discussed growth with her. (Pl. Dep. at 134.) Jackson testified that, when he fired the plaintiff, he only told her the branch was not trending well – ostensibly, a reference to growth issues. (Jackson at 68-69, 75-76). *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-853 (4th Cir. 2001) (fact that employer has offered different justifications at different times for its employment decision is probative of pretext).

The Court has not made any real determination as to the admissibility of the evidence or even the effectiveness of it to permit certain issues to be presented to the jury. But, as discussed, the defendant has not challenged any of this evidence as having the

17

propensity to show pretext or not, except to dispute that temporal proximity alone is insufficient. Of course, the plaintiff has not offered that reason in a vacuum. She has identified an entire set of circumstances, which the defendant must address before any motion for summary judgment can be seriously entertained by this Court as to the retaliation claim.

In aid of the district court and any potential future ruling, the Court would at least say the following. It is true that, while temporal proximity is sufficient at the *prima facie* stage, it is not by itself sufficient to establish falsity at the pretext stage. *See Eadie v. Anderson County Disabilities*, 8:07-3406-HMH-WMC, 2009 WL 537637, at *11 n.6 (D.S.C.2009) ("'While temporal proximity is sufficient to meet the low burden required to establish a prima facie case of retaliation . . ., it is not alone sufficient to establish that employer's legitimate, non-discriminatory reason for discharge was pretext.'") (quoting *Heady v. U.S. Enrichment Corp.*, 2005 WL 1950793, at *4 (6th Cir. Aug.16, 2005)); *Ragsdale v. Potter*, C.A. No. 8:05-142-RBH, 2006 WL 2827395, at *17 (D.S.C.2006) (holding that temporal proximity alone and on facts of case was insufficient to establish pretext from which a jury could infer retaliation); *see also Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir.1993) (temporal proximity is "too slender a reed on which to rest a Section 1983 retaliatory discharge claim"). The brief period of time between her report and her termination are not sufficient evidence to establish pretext alone. Of course, the plaintiff has offered more. It should be noted that the time period is exceptionally brief in this case. And, although not enough by itself, the Court would reject that it does not represent good evidence in conjunction with other material circumstances.

As to comments Maas may have made about his intent to fire other employees for filing sexual harassment complaints, such remarks neither relate to the plaintiff, specifically, nor any decision to terminate her employment. As a result, they are dubiously effective to say anything about the decision to fire the plaintiff, specifically. The fact that Maas may have similarly threatened the plaintiff does not change the calculation. The Court has not identified, and the plaintiff has not offered, any cases, which suggest that other bad acts of, or some pattern by, a supervisor, in unrelated circumstances, constitute credible evidence that a defendant's non-discriminatory reason for terminating employment in any

18

given instance, is, therefore, false.  In fact, all of the cases cited by the plaintiff relate to comments by a supervisor regarding the plaintiff, precisely, and not some other and unrelated employee.  *See Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1214 (3rd Cir. 1995)*; EEOC v. Manville Sales Corp.,* 27 F.3d 1089, 1094 (5th Cir. 1994); *Cooper v. Paychex, Inc.*, 960 F. Supp. 966, 970 (E.D. Va. 1997). This sort of evidence is of even more concern, where, as here, the plaintiff is lacking evidence that the person harboring the discriminatory motive has influenced, in any significant way, the termination decision.

Likewise the Court would have reservations about allowing a jury to conclude that the defendant's reasons for termination were false because the plaintiff felt subjectively as though Stokes was hostile or even that Stokes was, in fact, objectively so.  Sexual harassment investigations and disciplinary action are unpleasant for all involved.  Stokes may have had numerous private reasons for being hostile or unresponsive, including frustration with the plaintiff's performance or as an incident to nothing more than a bad day personally.  A jury may not guess about it.  The hostility alone, taken exactly as the plaintiff might describe it (see Pl. Dep. at 27-31), is not evidence of falsity.

More importantly, the fact that Stokes might have been suspicious or resistant to the plaintiff's account, even if Stokes was ultimately wrong, is no evidence of pretext.  It is not the province of the court to decide whether the reason for an employer's adverse employment action "was wise, fair, ***or even correct***, ultimately, so long as it truly was the reason for the [adverse employment action]."[4]  *See Dugan v. Albemarle County School Bd.*, 293 F.3d 716, 722 (4th Cir. 2002) (emphasis added).  The burden remains on the plaintiff to demonstrate that the reasons offered by the defendants are not simply incorrect but rather "unworthy of credence *to the extent* that it will permit the trier of fact *to infer the ultimate fact* of intentional discrimination."  *Id.* at 723 (emphasis added).

In a Seventh Circuit decision, the plaintiff was accused of theft.  *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935 (7th Cir. 2003).  The court stated that "it was up to [the

---

[4]  In *Dugan*, the plaintiff claimed that the defendant failed to properly apply a reduction-in-force policy.  The Fourth Circuit stated that "[e]ven if there is evidence that the school board erroneously or even purposely misapplied the RIF policy, it is not proof of unlawful discrimination." *Dugan*, 293 F.3d at 722.

plaintiff] to produce evidence showing that Wal-Mart *did not genuinely believe* that she had lifted the $12.65.  It is not enough for her to show that the investigators might have made a mistake in their conclusion."  *Id.* at 940 (citing *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir.1999). So long as the defendant honestly believed that the plaintiff's performance was poor, then her "claim cannot survive a motion for summary judgment." *See Adams*, 324 F.3d at 940.  Whether the plaintiff has produced evidence that the defendant did not so believe seems doubtful.  This same sort of reasoning applies in regards to the plaintiff's view that she was not, in fact, underperforming and whether she can bring forth evidence not simply that she was performing to expectations but that the defendant was aware of such acceptable performance and still characterized it as insufficient; in other words, she needs proof of more than just a mistake or difference of opinion.

In spite of all these concerns, the plaintiff has evidence that her termination occurred shortly after her complaint[5] and at the direction of Jackson who did not have sufficient basis to make any sort of judgment concerning her work.  The defendant may not have been fully consistent as to its explanation for the termination and may have been less than compliant with its typical procedures.  Because such considerations have largely been ignored in reply, issues of fact and law remain, and summary judgment should not be granted as to the retaliation claim.

---

[5]  The defendant has made a substantial response concerning Stokes and Vice President Tommy Jones' desire to terminate the plaintiff long before the plaintiff's report.  When the plaintiff's branch was audited on January 7, 2009, the results were "very concerning" to Jones. He was "quite disappointed with her first audit." (Def. Ex. G.) By March 2009, Maas also indicated he was "very concerned here." (Def. Ex. H.)  When the results of Maas' March visit were reviewed at home office, Tommy Jones wrote: "Lou, this is pathetic!" And with regard to Plaintiff's high delinquency rate, which wasn't even close to meeting standard, Mr. Jones wrote: "Worst I have ever seen." *(*Id.; see also Def. Exs. G-P.)* On the May 26, 2009 Growth Review that Maas faxed to home office, Stokes expressed her opinion that the plaintiff is "NOT ON OUR TEAM . . . It is time you change this bleak picture." (Def. Ex. K.)  However, these statements are only competing evidence to that of the plaintiff's, which a jury may or may not credit as far as the defendant would prefer and, as stated, it only relates to the temporal proximity portion of the plaintiff's argument that retaliation was the reason for her termination.

## **CONCLUSION**

Wherefore, based upon the foregoing, it is RECOMMENDED that the defendant's motion for summary judgment [Doc. 21] be DENIED.

IT IS SO RECOMMENDED.

s/Bruce H. Hendricks
United States Magistrate Judge

October 18, 2011
Charleston, South Carolina

21

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).